UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

         v.

Case No. 2:24-cr-20667
Hon. Denise Page Hood

BRIAN MAURICE BROWN

      Defendant.

_____

**MOTION FOR REVOCATION OF DETENTION ORDER AND
REQUEST FOR PRETRIAL SERVICES INVESTIGATION**

NOW COMES BRIAN MAURICE BROWN, defendant herein, by his attorneys, LaRene & Kriger, P.L.C., and moves this Honorable Court for the entry of an Order directing Pretrial Services to prepare a bond report and recommendation, and, upon the receipt of same, pursuant to 18 U.S.C. §3145(b) to revoke the previously entered Order of Detention, and releasing Mr. Brown on bond pending trial, under appropriate conditions, and in support of said motion says as follows:

1.    He is the defendant in the above-captioned cause, charged in the Indictment with one count of Conspiracy to Distribute and Possess and with the Intent to Distribute a Controlled Substance – to wit: 5 kilograms or more of a mixture containing cocaine, 400 or more grams of a mixture containing fentanyl, 1 kilogram or more of a mixture containing heroin, and 50 grams or more of methamphetamine;

1

one count of Possession of Cocaine with Intent to Distribute; one count of Possession of Fentanyl with Intent to Distribute; and Conspiracy to Launder Monetary Instruments. The government is also seeking an enhanced sentence for a prior serious drug conviction.

2.      At the detention hearing held on July 16, 2024, although the Honorable Kimberly Altman found that Mr. Brown overcame the presumption of detention (see DH audio, Pt. 4, 2:29-2:32; ECF No. 105, PageID.341), she, nevertheless, granted the government's motion for detention.

3.      The detention order was premised on the Magistrate Judge's finding that:

- The facts and circumstances "couldn't get more serious";

- a grand jury found probable cause to believe the allegations in the indictment – to wit: for approximately 4 years, Brown has been the leader of a multi-state drug conspiracy on a national scale that deals in large quantities of fentanyl and cocaine;

- Brown has the means to flee and, according to the government's proffer, "it took a while" for Mr. Brown to appear on the complaint in 2016;

- Most significantly, Brown had two federal cases – the first of which charged Mr. Brown with a similarly offense;

- Mr. Brown previously violated his supervision conditions by continuing to traffic drugs;

- The third-party custodians, Mr. Brown's wife and his sister, are unsuitable; and

- Residing in Georgia, even under home detention, is not a suitable condition because Mr. Brown previously resided in Georgia, and he continued to engage in drug trafficking.

*Id*. 2:58-9:21

4.      Notably, however, the Magistrate Judge's central findings were predicated upon information proffered by the government that only told part of the story. █████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████

5.      As also explained in his attached memorandum brief, in this Court's *de novo* review of the propriety of Mr. Brown's detention, a set of conditions can be fashioned which will assure Mr. Brown's appearance and the safety of the community; therefore, the Order of Detention entered by the Magistrate Judge should be revoked, and an Order allowing his release should be entered.

On March 26, 2026 undersigned counsel sought the concurrence of Assistant United States Attorneys Caitlin Casey and Rajesh Prasad. The parties have discussed

at length the nature of the relief requested and the bases for such relief, but concurrence was denied.

Respectfully submitted,

s/ Allison L. Kriger
s/ Mark J. Kriger
LaRene & Kriger, P.L.C.
500 Griswold Street, Suite 2400
Detroit, Michigan 48226
313-967-0100
akriger@larenekriger.com

Date: April 7, 2026

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

BRIAN MAURICE BROWN

Defendant.

Case No. 2:24-cr-20667
Hon. Denise Page Hood

_____

## MEMORANDUM IN SUPPORT OF MOTION FOR REVOCATION OF DETENTION ORDER AND REQUEST FOR PRETRIAL SERVICES INVESTIGATION

On December 16, 2024, when Defendant Brian Brown made his initial appearance, the government sought to detain him pending trial. ████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████

████████████████████████████████

████████████████████████████████████

1

████████████████████████████████████████████████

████████████████████████████████████████

In advance of the detention hearing, the parties submitted memoranda in support of their respective positions. The government's argument, at its core, was that Mr. Brown "has repeatedly violated the court's trust [by "brazenly continu[ing to] operat[e] his own drug business" while he was on bond ████████████ ████████████████████████████████████ Gov't Memorandum, p. 24 (emphasis added). To corroborate its position, the government primarily relied on drug evidence found in Mr. Brown's iCloud data – specifically, images of drugs and messages relating to drug trafficking.

At the time, Mr. Brown was not in a position to refute the government's claims and purported evidence of unlawful drug trafficking with anything more than *ipse dixit,* and, thus, the magistrate judge credited the government's claims and continued his detention pending trial. ECF No. 105.

Now, several months later, Mr. Brown *is* in a position to meaningfully challenge the government's claims and its evidence. Pursuant to 18 U.S.C. § 3145(b), defendant Brian Brown, therefore, prays for revocation of the order of pretrial detention entered by the Magistrate Judge who presided over his detention hearing.[1]

---

[1] The order of detention is attached as Exhibit A.

2

## APPLICABLE LAW

Upon such an application to revoke an order of pre-trial detention by a Magistrate Judge, a District Judge is to give *de novo,* independent consideration to the propriety of the defendant's detention. *See, e.g., United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010).

Where, as here, Mr. Brown is, in pertinent part, charged with controlled substances offenses carrying a ten-year mandatory minimum prison sentence, 18 U.S.C. § 3142(e)(3) sets forth a rebuttable presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." Notably, however, "[t]he quantum of evidence required to rebut the presumption is not high." *United States v. Thompson*, No. 16-CR-00019, 2018 WL 447331, at *2 (M.D. Pa. Jan. 17, 2018) (citation omitted). "***Any evidence* favorable to a defendant** that comes within a category listed in § 3142(g) can affect the operation of [the presumption], including evidence of their marital, family and employment status, ties to and role in the community … and other types of evidence encompassed in § 3142(g)(3)." *Dominguez*, 783 F.2d at 707. This is true of defendants charged with serious controlled substances offenses:

- *U.S. v. O'Brien*, 895 F.2d 810, 58 USLW 2538 (1st Cir., 1990): Defendant charged with narcotics trafficking, who was initially detained because he posed a serious flight risk, nevertheless overcame presumption against pretrial release where he consented to wear electronic monitoring bracelet and offered residence as security. The court further included as conditions of release telephonic reporting and unannounced home visits;

3

- *U.S. v. Robinson*, 820 F.Supp.2d 146 (D. Mass. 2011): Through proffer by his counsel, Defendant charged with narcotics distribution rebutted statutory presumption of detention where counsel suggested that the defendant be released on electronic monitoring to his mother's home in her third-party custody, and his mother verified she was willing to act in that capacity;

- *United States v. Anaya*, 376 F. Supp. 2d 1261, 1263–64 (D.N.M. 2005): Non-citizen charged with controlled substances offense overcame the presumption of detention where he established "long ties to the state (18-20 years of residency) … most of his family resides in the area … children … are all United States citizens," and "offered a $20,000.00 property bond on [ ]his land." While "there [wa]s some question of the legitimacy of [defendant's] concrete business … the business seem[ed] to be a legitimate business, even though it is only marginally profitable."

The impact of this presumption is, therefore, quite limited: "[i]n a presumption case such as this, a defendant bears a *limited* burden of production – not a burden of persuasion – to rebut that presumption by coming forward with evidence he does not pose a danger to the community or a risk of flight." *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir.2001) (emphasis added). And, the less the individual features of a defendant's situation "resemble the congressional paradigm," the less weight the presumption carries. *United States v. Jessup*, 757 F.2d 378, 387 (1st Cir. 1985) (Breyer, J., for the court).

Simply put, pretrial detention is reserved for "a small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stri[ct] release conditions nor the prospect of revocation of release can reasonably assure the safety of the community or other persons." S. Rep. No. 98-225, at 6-7 (1984),

reprinted in 1984 U.S.C.C.A.N. 3182, 3189. Here, "liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno,* 481 U.S. 739, 755 (1987).

It must also be remembered that the standard for conditional release under the Bail Reform Act is concerned with *reasonable assurances* not *certainties*: "The structure of the [bail] statute mandates every form of release be considered before detention may be imposed. That structure cannot be altered by building a 'guarantee' requirement atop the legal criterion erected to evaluate release conditions in individual cases." *United States v. Orta,* 760 F.2d 887, 892 (8th Cir.1985) (en banc).

In assessing whether there exists a set of conditions that will reasonably assure Mr. Brown's appearance and community safety, 18 U.S.C. § 3142(g) instructs the Court to consider, *inter alia*, the following relevant factors:

(1) the nature and circumstances of the offense charged, including whether the offense involves a controlled substance, firearm, explosive, or destructive device;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including;

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

Because the Bail Reform Act specifically provides that it shall not "be construed as modifying or limiting the presumption of innocence 18 U.S.C. § 3142(j), the Court's review of these factors must always be with an eye to the presumption that the defendant is, indeed, innocent of the charges against him.

## ARGUMENT

**1.  The nature and circumstances of the offense do not preclude release.**

The nature and circumstances of the offenses charged involve controlled substances offenses that, with an enhancement, carry a mandatory minimum 15-year prison sentence See ECF No. 1, PageID.9. Significantly, however, **the offenses do not include *any* firearms, explosives, destructive devices, or other dangerous weapons**. Indeed, although the government conducted searches of multiple residences, vehicles, and persons, both in 2023 and 2024, they did not find any weapons connected to the charged offenses or to Mr. Brown.

The indictment alleges that between October 2020 and March 31, 2024, Mr. Brown conspired to primarily traffic cocaine and fentanyl. It also alleges he conspired to launder drug money.

According to the discovery, in *May of 2022*, a confidential source advised the government that Mr. Brown was responsible for trafficking multi-kilogram quantities of heroin monthly. ████████████████████

████████████████████████████████████████

6

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

In September of 2023, almost a year and a half after Mr. Brown was discharged from supervision, the government conducted surveillance of a property on Bellows Court ("Bellows"), which is listed as co-defendant Dominique Glenn's residence. Law enforcement observed Mr. Brown at Bellows both in the afternoon and later that evening. Co-defendants Glenn, Zion Speed, and Demecko Motten were also observed at the residence throughout the day.

At approximately 3:00 P.M., Mr. Brown was observed at Bellows placing a bag into the rear of Ms. Glenn's vehicle. A couple hours later, Michigan State Police conducted a traffic stop of the car and recovered three bricks of cocaine.

Several hours after the traffic stop of Ms. Glenn's car, agents conducted a traffic stop of Mr. Motton and recovered five bricks, some of which contained cocaine and some of which contained fentanyl. Around the same time, agents

7

apprehended Mr. Speed as he was leaving Bellows. Cocaine was found under the seat of his car.

Following those seizures, a search warrant was executed at the property on Bellows Street, but no drug evidence was recovered.

The drug seizures on September 15, 2023, provide the underlying factual predicate for Counts 2 and 3, in which Mr. Brown is charged. And, based upon the discovery produced to date, the evidence supporting Count 1 is predicated upon data (*i.e.* images and messages) obtained from Mr. Brown's iCloud and information from a confidential source. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████

Assuming *arguendo* the weight of the evidence *is* strong – which it is not – "the weight of the evidence is the least important of the various factors," and it is error "to accord[ such] great weight to the charges against [a defendant] and the Government's assertions of his guilt." *Motamedi*, *supra* at 1408 (Denying reconsideration of order reversing the district court's detention order for defendant, an Iranian citizen, who exported military items after being warned that it was illegal to do so, and after telling the United States Attorney that he had ceased doing so; and maintained large bank accounts in foreign countries).

8

The same is true even where the defendant is facing a potentially lengthy sentence. Although Mr. Brown is facing a mandatory minimum 15-year prison sentence, courts reject government requests for detention, instead ordering pretrial release, in cases where the evidence against a charged defendant was not only strong and carried a presumptively long prison sentence but also where the defendant was either a non-citizen (unlike Mr. Brown) or a naturalized citizen with substantial contacts with foreign jurisdictions (also unlike Mr. Brown), and, therefore, potentially posed a serious flight risk:

- *United States v. Sabhnani*, 493 F.3d 63 (2d Cir. 2007) (reversing district court order of detention of defendants, who were natives of Indonesia, and ordering release despite defendants' "strong motive to flee" because of serious charges and "strong" evidence of guilt, despite finding that defendants faced "lengthy term of incarceration" if convicted, despite finding defendants possessed "ample means to finance flight," despite finding that defendants "maintained strong family ties to their native countries as well as personal and professional ties to various locations in Europe and the Middle East," and despite finding that defendants "could, with relatively little disruption, continue to operate their highly lucrative business from any number of overseas locations");

- *United States v. Hansen*, 108 F. App'x 331 (6th Cir. 2004) (affirming district court order of pretrial release of defendant, a resident and citizen of Denmark-from where defendant could not be extradited-charged with bulk cash smuggling and forfeiture, noting that the "bail statute does not . . . require that foreign defendants be detained simply because their return cannot be guaranteed through extradition");

- *United States v. Karni*, 298 F. Supp. 2d 129 (D.D.C. 2004) (ordering release of defendant, an Israeli national who had resided in South Africa for the 18 years preceding his arrest when he landed in Colorado for a family ski trip based on allegations he violated the Export Administration Act and the International Economic Emergency Powers Act by acquiring products capable of triggering nuclear weapons and exported them to Pakistan, despite

9

defendant's lack of any ties to the United States, despite finding that defendant had "no ties to the United States or the Washington, D.C. area," despite finding that "no evidence [was] presented establishing that Defendant has ever lived in this country, owned property here, or that he has any family or community ties in the United States," despite finding that defendant "was only in this country in order to participate in a ski vacation with his wife and daughter," and despite finding that "the weight of the evidence against Defendant is substantial");

- *United States v. Hanson*, 613 F. Supp. 2d 85 (D.D.C. 2009) (ordering release of defendant, a naturalized citizen of the United States, despite finding defendant "has strong ties to [her home country of] China," finding that the defendant owned property in China, that the defendant spent almost all of her ten years of marriage living abroad with her husband, that during 2008 the defendant spent only 22 days in the United States, that the charges against the defendant (violations of International Emergency Economic Powers Act and the Export Administration Regulations) "were serious and carried a potential for a significant period of incarceration" and that the "government has strong evidence against" the defendant "including her own statement to investigators that she smuggled the UAV autopilot components out of the United States and knew there were licensing requirements for such items").

This Court has similarly ruled. In *United States v. Vasan Deshikachar*, No. 18-20351 (E.D. Mich.), for example, the defendant, a doctor with strong ties to India, was charged with conspiracy to distribute 344,000 dosage units of Schedule II opioids valued at more than $9.6 million. In *Deshikachar*, this Court entered an order revoking the previously entered detention order [see, generally, *Id*. at ECF No. 70, 71 (Edmunds, J.)], notwithstanding the defendant: 1) possessed financial assets through foreign bank accounts and wire transfers, as well as bitcoin allegedly valued at $1,000,000; 2) had no verifiable employment, 3) had substantial ties to India; 4) owned an airplane; 5) frequently traveled out of the country in the three years

10

preceding the indictment and traveled out of state; 6) possessed two false passports; 7) possessed a firearm; and 8) the weight of the evidence was extremely strong. See, generally, Gov't Response to Motion to Revoke Detention Order, No. 18-20351, ECF. No. 65. Following his release from custody, Dr. Deshikachar fully complied with his release conditions. Surely, if a set of conditions existed that reasonably assured his appearance and community safety, then the same is true for Mr. Brown.

**2. Mr. Brown's background and circumstances rebut any presumption in favor of pretrial detention.**

   **a. Character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, and criminal history.**

Brian Brown, who is now 55 years old, was born and raised in Detroit. He has one sister, Nikki Brown. Mr. Brown's childhood and early adulthood were riddled with tragedy. He was physically abused by his father, and both of his parents were killed in 1993, when he was in his early 20s. See Sentencing Memorandum, *United States v. Brian Brown*, Docket No. 16-cr-20195, ECF No. 45, PageID.114. His mother was killed by the police, and his father was murdered two weeks later. See Akia Brown letter, p. 2.

Mr. Brown has no history of drug or alcohol use. In 1999, however, approximately six years after his parents were killed, Mr. Brown was indicted for conspiracy to distribute cocaine and cocaine base. He was released on an unsecured

11

bond, and during the pendency of his case, he fully complied with his conditions of release. In 2001, he was convicted by a jury and sentenced to 188 months in prison. In 2008, his sentence was reduced to 148 months, and he was released from prison two years later, in 2010.

After his release from prison on October 25, 2010, Mr. Brown returned to Detroit. The following year, he married his wife, Akia Brown, and endeavored to build a large, close-knit family and a successful record label and entertainment business, BMB Entertainment. He did both.

In her letter, Mr. Brown's wife of 14 years, Akia – who works two jobs, and has additionally worked as a licensed real estate agent in Michigan and Georgia since 2008, as well as a licensed residential builder in Michigan (collectively attached as Exhibit B) – describes the positive impact her husband has had on her life, his commitment to having a meaningful relationship with his children, and the success they have enjoyed as a result:

> [Brian and I] have been happily married for 14 amazing years, and we currently have 6 incredible children together but a combined family of 18 wonderful kids. I have known and dated Brian for the past 27 years of my life. When I met Brian, I was a lost 22-year-old with 2 kids and no vision of life in general. I was living without purpose. Brian CHANGED my life with his unconditional love for not only me but people in general. He showed me that life is all about love and helping people in need whether it be mentally, physically, emotionally or financially, if you have it in your power to assist someone for the greater good than do it. Since being in a relationship with him I have obtained my associate's degree in business administration, Bachelor & master's degree in construction management. I have become a successful business owner and self-published Author. I have also started a

12

non-profit organization where I give back to underprivileged children teaching BELLA'S, Business, Entrepreneurship, Learning Leadership & Accounting Skills.

***

Brian has been there to support me throughout all of my pregnancies but my most memorable pregnancy was with our daughter, Mauri. He was so excited when I got pregnant with her he attended every doctor's appointment. Brian has been there for the births of our children holding my hand and supporting me every second of the way. Brian makes sure he supports all his kids physically and mentally. He has supported our daughters Breann & Mauri at cheer competitions all across the world. Our son BJ who has played basketball in several states and counties. He goes to the basketball games and puts family first. He has supported Bella at her recitals and school events. He does daddy daughter dances, donuts with dads you name it he has been a presently a part of their life.

Breann our oldest daughter is due to graduate on May 2, 2025 from Tennessee State University on the Dean's List with a Bachelor's Degree in Psychology. BJ has crossed as a Kappa Alpha Si and also just accepted an offer to The University of West Alabama a Division II college to play basketball, also a Dean's List student. Mauri is entering High School in the fall on the Honor Roll. They will all tell you the impact of their dad's presence in their life has been impactful to their success.

In a more somber tone, Mrs. Brown discloses her congestive heart failure diagnosis and emphasizes her husband would never abandon her or their children:

Unfortunately, I was just diagnosed with Congestive Heart Failure with an ejection factor of 18 which is a condition worse than breast cancer.

I know if he was to get a bond, Brian would never abandon me and our children. Because for all the loss he has, he also built a strong community with family and friends. He knows that him being incarcerated without any notice to get our affairs totally in order has already served as a tremendous hardship on our family and he knows the condition of my health and my heart.

Similar sentiments are shared by long-time friend, Juaria Tatum:

13

Brian and I met through family members. And over the years I have seen his love for family and friends develop into an insatiable desire to please everyone he loves. I watched Brian care for his aging grandparents and have had the ability of seeing him be a very present father in the lives of his children. The type of father that is there to pick them up from school daily and the type of father who is present at every extra curricular activity his kids participate in.

Brian Brown, Jr., echoes these sentiments:

From a young age, [my father] instilled in me as he did all my younger brothers also the true essence of what it means to be a man. A protector, a provider, and a stabilizer … I realized those three words were some of the most important lessons I would ever learn … It's a way of life, a mindset that shapes everything you do … my dad always reminds me that it's my responsibility to take our family further than he was able to. As a college student-athlete, that's not just my motivation for playing basketball, it's the driving force behind how I want to live the rest of my life …

My father may not be a perfect man, but he loves hard and it's unwavering. Besides his imperfections, he's the cornerstone of our ever growing family … always encouraging me to strive for excellence and to hold myself to the highest standards, so I never settle for mediocrity. It's this constant drive for personal growth and his unwavering belief in me that strengthens the bond between us. I look up to him not just for the man he is, but for the way he challenges me to become the best version of myself, pushing me to exceed my own expectations. What truly stands out about him is his capacity for love.

So, too, does publicist, author, and filmmaker, Treavion Davenport, who

worked with BMB Entertainment and authored Mr. Brown's biography, write:

Brian is … a loving and involved father. He never fails to show up for all of his children. I've watched him go from setting up an artist in Beverly Hills, California, back to Georgia to attend daddy-daughter-dance or his children's sporting events. He's a very hands-on parent, and he always taught the value of academic achievement. His older children are either in college or college graduates, with careers. I cannot overemphasize that if

14

for no other reason, Brian would comply his bond conditions to ensure he can maximize his time with his children. He could never leave him behind. His family means the world to him. He teaches his sons this mantra: protect, provide, and stabilize.

Former grammy-nominated BMB artist, Deandre Coker, known as Dre Butterz, in his letter, likewise writes:

I came to know [Brian's] family and saw him firsthand as a father. No matter what he was doing, he was making it home to be there for his children. He was making sure they went school, did their homework, and studied for tests. He would also go watch basketball games and cheer competitions that his kids were in. He went to parent teacher conferences. It was something to aspire to be. I really admired him for it. I have two children of my own now, and Brian taught me what it meant to show up for your kids and the people who matter to you. Every single year around Christmas time, he made time to stop by and visit.

Beyond building a close-knit family, prior to his arrest, Brian has spent the last fifteen years building his business, BMB Entertainment. His long-time entertainment lawyer, Robert Celestin, validates BMB Entertainment and Mr. Brown's success, strong work ethic, and integrity:

I've had the honor of representing Brian Brown and his record label, BMB Records LLC of Detroit for the past ten (10) years as his entertainment attorney. My work has primarily included negotiating contracts between BMB and the various artists with whom BMB has worked. I am also responsible for legal matters relating to intellectual property and dispute resolution.

During this time, I've always been impressed with Brian's vision and strong work ethic. Detroit is, and always has been, a music hub, and he's made an effort to connect with folks in the industry who taught him the trade. It is additionally apparent that he has a keen eye for identifying talented artists, and, ultimately, he built a space dedicated to providing young Detroit-based recording artists with an opportunity to develop their

15

talents, and record, market and distribute their music. In that vein, Brian found ways to maximize the earning potential for BMB artists and BMB through brand partnerships and media placements. He also mentored many of the artists and provided them with an alternative to the streets.

In the decade we've worked together, Brian has been honest and conducted his business as well as his relationship with the artists and the Detroit community with integrity. He has also always followed through on his commitments. In my experience, Brian's word is his bond, and if this Court grants him a bond pending trial, I believe he will abide by any conditions of release imposed.

Treavion Davenport similarly discusses Mr. Brown's success in the music

industry:

I have been present since the inception of BMB Entertainment in 2013. It started as an independent label that was, in part, designed to help resurrect careers of talented artists that had faded for one reason or another. Charli Baltimore was one of those artists. In the early 2000s, she worked with Notorious B.I.G., Ashanti, and Ja Rule, and others, but her career died down. In 2013, she started working with Brian, and by 2014, she was nominated as the best female MC. Charli is only one of a number of artists he has worked with who have attained great success. Although I have not worked in-house with BMB in approximately 5 years, we will continue to collaborate. Most recently, I've worked with his artist, Brooklyn B, who has become a sensation in the music industry.

Mr. Coker (a.ka. Deandre Butterz) shares his experience with BMB records:

My name is Deandre Coker. People call me "Dre Butterz." I am 41 years old, and I am a platinum grammy nominated singer, composer, and producer. I met Brian about ten years ago through some mutual friends. I was working with an artist, and he was looking for new talent. At the time, I was working with Denaun Porter who was with Shady Records, Eminem's record label.

Brian immediately took me in as family, and he gave me a position at BMB. I was early in my career, but he recognized that I was a hard worker.

16

> Within six months, we went on tour to approximately 10 cities. It was a hit. We were selling out shows, even at the house of blues in Los Angeles.
>
> Through Brian, I … buil[t] a network in the industry. I was producing, writing, and engineering in Detroit and in Atlanta, Los Angeles, and Miami several times per month. Although I worked really hard, I definitely credit Brian for giving me the opportunity to prove myself.

Additional themes emerge throughout the letters: Mr. Brown's commitment to service as well as his reputation for honesty, integrity, and peacefulness. Mrs. Davenport recounts Mr. Brown's philanthropic work and his recognition for the same by the City of Detroit:

> Throughout our years of working together, I have also witnessed Brian's unwavering commitment to helping others, often putting their needs before his own. His generosity, work ethic, and dedication to his family and community are undeniable. Brian is a man of vision and integrity, and his influence has changed the lives of countless individuals striving to build a better future. We've worked together on various philanthropic efforts, such as a football camp with former NFL defensive end Michael Johnson, as well as recurring events for Coats for Kids and Toys for Tots. We also collaborated to host a community Thanksgiving Dinner for folks who had nowhere to go on Thanksgiving. These are only a few examples of the work Brian has done. Many of them are behind the scenes, and they don't get attention. Even so, Brian has gained the admiration of leaders in our community. In 2019, he received the Spirit of Detroit award, which recognizes "exceptional achievement, outstanding leadership, and dedication to improving quality of life."[2]

> Mr. Coker echoes these sentiments:

> In all the years I've known Brian, I've never seen him act violently, nor did I ever see anything that suggested he did…

---

[2] A copy of the Spirit of Detroit Award is attached as Exhibit C.

Two other qualities that Brian has shown time after time is that he is reliable and he is honest. If he told me he would do something, he always followed though. And if for whatever reason he couldn't do something, he would just say it outright. I understand he's been charged with a serious crime, but based on all my dealings with Brian over the last 10 years, I believe if he were released on a bond he would do whatever he was asked to do, and he would have a village of people there supporting him[.]

Likewise, Mr. Celestin writes:

In the decade we've worked together, Brian has been honest and conducted his business as well as his relationship with the artists and the Detroit community with integrity. He has also always followed through on his commitments. In my experience, Brian's word is his bond, and if this Court grants him a bond pending trial, I believe he will abide by any conditions of release imposed.

Accordingly, I hope that you will strongly consider Brian's positive contribution to the Detroit recording industry as well as to the numerous artists and their families when you evaluate whether a set of conditions exist that could reasonably assure his appearance or the safety of any other person in the community.

Long-time friend, Natasha Neal, who works as an account manager for

Verizon Wireless, expresses similar thoughts:

Brian has been a valuable mentor to my son, providing guidance and support during challenging times. Through their conversations and Brian's encouragement, my son has stayed positive and focused on his goals, especially in the realm of sports, which has allowed him to manage frustration and channel it productively. This is just one example of Brian's willingness to help others, especially the younger generation, navigate their personal struggles.

What stands out most about Brian is his genuine care for his family and friends. He has always been dedicated to his loved ones, providing emotional and practical support in difficult times. I have never known him to be violent or aggressive in any situation; rather, he is a calm and thoughtful individual who values peace and respect. His generosity,

18

honesty, and strong sense of integrity are qualities I have observed firsthand.

### b. Mr. Brown's criminal history following his release from prison.

Mr. Brown was released from prison in 2010. Six years later, on March 22, 2016, while he was on supervised release, Mr. Brown was arrested on a complaint alleging unlawful firearm possession. According to the Complaint, the firearm was found during the execution of a search warrant in November of 2015. During the detention proceedings in the instant case, the government discussed the investigation that led to the firearm seizure and contended that it was investigating Mr. Brown for drug trafficking violations. But myriad search warrants were executed, and no drugs or money were ever found. Instead, law enforcement found a stolen firearm and "a money counter, [unidentified] drug packaging materials, [and] latex gloves" in an apartment Mr. Brown shared with his girlfriend." Government Memorandum, p. 2.

The government additionally claimed that Mr. Brown, who was not present during the search warrant execution, was on the run during this time, and it took the government months to find him. *Id*. at 3. But, what the government failed to disclose to the duty magistrate, is the fact that between November of 2015 and March of 2016, the complaint was *sealed*, and Mr. Brown had no way of knowing he had been charged. Further, at all times between November of 2015 and March of 2016, Mr.

19

Brown's address remained the same, he never left the Detroit area, and he was ultimately arrested at the Roostertail in Detroit.

20



---

[3] The rules of evidence do not apply to detention proceedings. 18 U.S.C. § 3142(f). Polygraph examinations are, therefore, properly considered in such proceedings. *See United States v. Bellomo,* 944 F.Supp. 1160 (S.D.N.Y.1996) (polygraph evidence was properly considered by district court in reviewing pretrial detention order, even though inadmissible in criminal trials, given inapplicability of evidentiary rules to detention hearings under Bail Reform Act).

[4] Mr. Beyer's curriculum vitae and the Polygraph Report are collectively attached as Exhibit D.



Specifically, the government included messages dated October 24, 2020, between

22

Mr. Brown and a California source of supply, Dorian Leniar, in which Mr. Brown arranged the sale of two kilograms of black tar heroin, which was later seized.

The government additionally relied on messages between Mr. Brown and a Mexican source of supply as well as messages between Mr. Brown and co-defendant John Bryant. These messages included the following images:






23



24



**3. A set of conditions exist that will reasonably assure Mr. Brown's appearance and the safety of any other person and the community.**

25

Additionally, while Mr. Brown was previously subject to location monitoring after his arrest in 2016, he was fully compliant with his conditions of pretrial release. There is no reason to believe the imposition of a GPS tether would not be effective in reasonably assuring his appearance and community safety. *See* e.g. *United States v. Paulino*, 335 F. Supp. 3d 600, 618 (S.D.N.Y. 2018) (releasing violent gang member on bond with GPS tether, noting the advancements in electronic monitoring.)

This is particularly true given **this prosecution does not involve any firearms or other weapons**, and Mr. Brown has demonstrably his strong ties to the community, strong family relationships, friendships, and relationships with upstanding members of the community, and a legitimate, long-standing business.

Further, that a set of conditions exist that could reasonably assure Mr. Brown's appearance and community safety are corroborated by co-defendant John Bryant's release on bond and his compliance with his release conditions. To be sure, John Bryant has a long, documented history of drug trafficking. On February 15, 2000, he was sentenced to 235 months in the Federal Bureau of Prisons, which was later amended to 210 months. *See* Violation Report, 97-cr-81373, ECF No. 587, PageID.555-56 (Cox, J.). He was released on a five-year term of supervised release on August 2, 2013, and in December of 2016, probation filed petition for a show-cause hearing in connection with allegations that he violated his term of supervised

26

release by traveling to another state with permission and failing to notify probation of police contact. *Id*. at PageID.56. ███████████████

████████████████████████████████████████████

███████████████████

Less than three years later, Mr. Bryant and his son, John Bryant, Jr., were arrested during a traffic stop in the State of Arizona after law enforcement found two kilograms of fentanyl and a pound of heroin. The traffic stop followed an investigation into Mr. Bryant for fentanyl and heroin trafficking, including multiple intercepted telephone calls. While that case was pending, and Mr. Bryant was on bond, he allegedly began conspiring with Mr. Brown and his co-defendants in the instant indictment. *See* Motion to Modify Release Condition, ECF No. 119, PageID.443. Still, he was released on bond, and, apparently, has done so well, this Court agreed to reduce his conditions. *Id*. at PageID.453.

Mr. Bryant's full compliance with his release conditions with the imposition of location monitoring establishes that similar conditions of release can be fashioned for Mr. Brown to reasonably assure his appearance and community safety, notwithstanding his history.

Moreover, Mr. Brown's mother-in-law, 76-year old Shirly Sutton, has agreed to serve as his third-party custodian. As set forth in her declaration [Exhibit F], she has no criminal history (¶2), and she was gainfully employed in management

27

positions until her retirement several years ago (¶3). Having held management positions for years, and as an unofficial-third-party custodian for her daughter, Mr. Brown's co-defendant and wife, Akia, Ms. Sutton is particularly suitable, attesting:

> … I have extensive experience supervising employees and daily operations, evaluating employee performance, delegating responsibilities, identifying potential risks to the company, and ensuring the team would meet company goals. All of my responsibilities required meticulous attention to detail, as well as a high degree of trust in my judgment and abilities.
>
> ***
>
> Although I am not formally Akia's third-party custodian … I have helped ensure that my daughter maintains full compliance with her bond conditions. If … Brian, is released to our home in Georgia, I will similarly ensure that he maintains compliance with his bond conditions. I am willing and able to act as his third-party custodian, and I would take that responsibility extremely seriously ... I am available to be with him at all times, and I am prepared to report him to the Court, pretrial services, and the police if I so much as suspect he violates his bond.

Shirly Sutton Decl., ¶¶ 4, 6.

If this Court finds it additionally necessary, it can confine Mr. Brown to his home, either in Georgia with wife, children, mother-in-law, and grandmother-in-law, or at his home in Ypsilanti, Michigan. The home in Georgia "is equipped with interior and exterior cameras, and, thus, the pretrial services would have the ability to monitor Brian at all times." *Id*. at ¶ 7.

## CONCLUSION

For the reasons set forth above, this Court should order pretrial services to investigate the suitability of his Georgia and Michigan residences for his release

pending trial, and, following a hearing enter an order releasing him on bond pending

trial, under any conditions this Court and Pretrial Services deem appropriate.

Respectfully submitted,

**LaRene & Kriger, P.L.C.**

*/s/ Allison L. Kriger*
Mark Kriger (P30298)
Allison Kriger (P76364)
500 Griswold Street, Suite 2400
Detroit, Michigan 48226
(313) 967-0100
akriger@larenekriger.com
mkriger@sbcglobal.net

DATED: April 8, 2026